Syllabus.

GYSBERT DE CLERQ *et al.*

*v.*

FRANCIS JACKSON *et al.*

*Filed at Ottawa May 12, 1882—Rehearing denied September Term, 1882.*

1. PURCHASER — *when he will hold subject to equities against his grantor—title held in trust.* Where one person acquires real estate, but has the deed made to another for his benefit, the grantee is but a trustee for him, and subject to the same equities that would have applied against the beneficiary had the conveyance been made to him, and the same rule applies to a grantee of the trustee who does not pay for the property until long after the filing of a bill to impeach and avoid the several conveyances.

2. CREDITOR'S BILL—*as against one holding under a deed which is a mortgage.* Where one having notice that an absolute deed is only a mortgage to secure a debt, procures a deed from the mortgagee, he will occupy the position of assignee of the mortgage, and his title will not be subjected, on creditor's bill, to the payment of a judgment against the mortgagor, when no redemption from the mortgage is sought. The creditor will be required to pay him the mortgage debt before divesting him of his title.

3. PAYMENT—*whether a particular transaction amounts to a payment.* A person conveyed four lots to an agent of an insurance company to secure the payment of notes to the company for money loaned, and also assigned a policy of insurance upon his life to the same agent, as security for the payment of two other notes given the company for another loan, and the agent gave back a writing, stating that if the notes, or either of them, was not paid, the agent might surrender the policy to the company for its value, to be determined by the officers of such company, and such sum should be applied upon the four notes, whether due or not. The policy was not surrendered to the company upon any terms, but the agent assigned the same to another person: *Held,* that the contingency on which the proceeds of the policy were to be applied on the notes never happened, and that payment of the notes could not be held as against one acquiring the lots from the grantee of the debtor.

4. SAME—*satisfaction of a judgment—conveyance of land to be applied thereon.* Where the beneficial plaintiff in a judgment takes a conveyance of a lot to be applied in payment on the judgment, no price being agreed upon for the lot, or as collateral security for the payment of the judgment, such conveyance will not operate to satisfy the judgment, so as to prevent the subsequent issue of an execution, and a levy and sale thereunder. The judgment creditor in such case, in the absence of proof of the value of the lot conveyed, will be held as having been paid only the net sum realized from the property above all prior liens and incumbrances paid by him to make the title clear and good.

APPEAL from the Superior Court of Cook county; the Hon. GEORGE GARDNER, Judge, presiding.

Mr. H. M. MATTHEWS, for the appellants.

Mr. JOHN P. WILSON, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This was a bill in chancery, by certain judgment creditors of Obadiah Jackson, deceased, to subject real estate, whereof they claim he died seized, to the payment of their judgments. Of the real estate in question four lots were conveyed by Jackson, in his lifetime, to Lewis C. Grover, and subsequent to Jackson's death Grover conveyed the same lots to Alice M. Bradford, and she conveyed them to the Chicago West Division Railway Company. At the time the lots were conveyed by Jackson to Grover, and as a part of the transaction, an agreement in writing was entered into, whereby it was, among other things, agreed as follows:

"Whereas, Obadiah Jackson and wife have conveyed by warranty deed, dated September 5, 1876, lots 51, 52, 53 and 54, in C. R. Field's subdivision, etc., and said deed, though in form absolute, is, in reality, given to secure the payment of two notes of Obadiah Jackson, for $1750 each, to the Mutual Benefit Life Insurance Company, of Newark, New Jersey, one in nine and the other in twelve months, with seven per cent interest; and whereas, the said Grover has delivered *in escrow* to Nehemiah Perry a quitclaim deed of said lots, executed by him to the said Jackson: Now, if the two notes are paid at maturity, said Perry shall deliver the said quitclaim deed to the said Jackson; but if the said two notes are not paid within sixty days of their maturity, respectively, then the said Perry shall return the said quitclaim deed to the said Grover, and the said Grover shall deliver the said notes to the said Jackson, and the deed and title of said lots be absolute in the said Grover, or the said Grover

may cause the mortgage to be foreclosed in equity. And whereas, the said Jackson has assigned policy No. 58,050, in the said Mutual Benefit Life Insurance Company, at Newark, New Jersey, on his own life, to the said Grover, which assignment, though in form absolute, is a security for the payment of two notes, dated September 5, 1876, of said Jackson, for $1750 each, to the said insurance company, one in three and the other in six months, with seven per cent interest: Now, if these two notes are paid at maturity, the said Grover shall re-assign said policy to said Jackson, and if said notes, or either of them, is not paid at maturity, the said Grover may surrender to said insurance company said policy, for the value thereof, to be determined by the officers of said company, and such sum shall be applied upon the four promissory notes herein described, whether they are due or not due."

In March, 1877, Obadiah Jackson assigned this insurance policy to Francis Jackson, who thereafter, until Obadiah's death, paid the premiums on the policy. After the death of Obadiah Jackson, Francis Jackson, through his attorney, proposed to the insurance company to exercise its right to surrender the two notes secured upon the four lots, take the title to them, and he would purchase them, paying therefor the amount due on the two notes surrendered, and also to purchase of the company judgments which it had obtained on the other two notes. The proposition was accepted, and the contract thus closed was carried out. By direction of Francis Jackson the four lots were conveyed to his sister, Alice M. Bradford.

The case must be considered just as if the title to the property were in Francis Jackson, for Alice M. Bradford was but a trustee for him, and it appears the railroad company did not pay for the property until long after the filing of the bill. But, as between Francis Jackson and these complainants, it is quite clear that he is, at least, entitled to occupy

the position of assignee of a mortgage, and the bill does not seek to redeem from his mortgage. He purchased whatever right the insurance company had in these four lots. If it was an absolute title, he got an absolute title. If they held them only as mortgages to secure the payment of the two promissory notes, then he purchased their right to have them subjected to the payment of the amount due upon those notes.

It is claimed on behalf of appellants, however, that Francis Jackson was bound to apply the proceeds of the insurance policy in satisfaction of these notes. The policy was certainly not assigned to him by Obadiah for that purpose, but, as the evidence shows, in part security or indemnity for a large indebtedness from Obadiah to ·Francis, growing out of the settlement of their deceased father's estate, and the only ground for claiming that the proceeds should be so applied is the language of the agreement between Obadiah Jackson and the insurance company, that "if said notes, or either of them, is not paid at maturity, the said Grover may surrender to said insurance company said policy, for the value thereof, to be determined by the officers of said company, and such sum shall be applied upon the four promissory notes herein described, whether they are due or not due." But the sufficient answer to this position is, "said Grover did not surrender to said insurance company said policy" upon any terms. On the contrary, it was assigned to Francis Jackson, and he subsequently paid at least one installment of premium upon the policy. The contingency in which the proceeds of the policy were to be applied to the payment of the four notes, never happened.

As to the other real estate sought to be reached, the facts are substantially these: On the 24th of August, 1876, Obadiah Jackson gave his judgment note for $7000, guarantied by Horace White, to the Commercial National Bank. White was compelled to pay the note, and, at his instance and for his benefit, the bank thereupon assigned the note to

David Vernon, and on the 14th day of November, 1876, judgment was entered thereon in favor of Vernon, for the benefit of Horace White, for $7071.75. On the 21st of the same month, Obadiah Jackson and his wife conveyed to Horace White the premises known as 375 Dearborn avenue, on account of the same indebtedness for which the judgment was rendered, and on the 25th of the same month an execution was issued on the judgment, and levied on certain household goods, pictures, etc., belonging to Obadiah Jackson, from the sale of which White realized $3438.75, less sheriff's fees, $61.25, and custodian's fees, $10, which had to be deducted. On March 22, 1877, Horace White, through his attorneys, caused the judgment to be assigned to John P. Wilson. On the 13th of April, 1877, an *alias* execution was issued upon the judgment, and subsequently levied upon certain lots in Cook county, which were sold to John P. Wilson; and it is claimed this sale should be set aside, because the judgment had been paid before it was assigned to Wilson.

The evidence, in our opinion, shows the deed for 375 Dearborn avenue was in the nature of collateral security for the judgment. White says Jackson had promised him a deed of the property before he obtained the judgment, but neglected so long to execute it that he despaired getting it, and so had the judgment entered. When the deed was executed no agreement was made, no price was fixed upon the property, and at no time was there any agreement of how it was to be accounted for. Of course both parties understood it was a payment on the debt evidenced by the judgment; but in the absence of an express agreement that it should be accepted in absolute satisfaction of the debt, it could only be equitable to treat it as a payment to the extent that it actually did so. What it was reasonably worth is not proved, except presumptively from the fact that White sold it to Ella Kennett for $19,000. Let this be regarded, however, as its reasonable value, and we have this result: Value of

property, $19,000; but it was incumbered, and to relieve those incumbrances, so as to realize this amount, he had to pay, on foreclosure sale under bank trust deed, $10,000; he had also to pay, in consequence of back taxes, mechanics' liens, special assessments, etc., $2898.26; then White had to deposit with J. H. Reed, as security to George Crozier, assignee of a mortgage covering a small portion of this ground, with other property, $500; and he had to pay Francis Jackson, also, who owned one-third of the property, $2000,—making a total of $15,398.26; this, deducted from the value of the property, left to apply on the judgment only $3601.74. But even this is not free to be applied on the judgment. White had to execute two bonds for $5000 each, —one to Jeannette Smith and the other to George Crozier,— to indemnify them from loss for releasing a mortgage on a portion of this property in the event that Francis Jackson should succeed in his claim to one-third of the property. What that amount may be is not yet known, and of course was not, and could not have been known when the judgment was assigned. Necessarily, therefore, when the judgment was assigned, this was the state of facts: There was a judgment for $7071.75; credited by amount realized on execution sale, after deducting sheriff's and custodian's costs, $3367.50—balance due, $3704.25; and to meet this, an indefinite balance between $3601.74 and nothing, to be ascertained after settling the liability of White on the two $5000 bonds.

The judgment then, it is clear, was not, in fact, paid. Had Obadiah Jackson, on the day the judgment was assigned, filed a bill alleging and showing these facts, it can surely admit of no doubt that he would not have been entitled to have a decree entered that the judgment was satisfied. As between him and White, it was not satisfied, and is not yet satisfied. White then had in the judgment, notwithstanding these transactions, something to assign—there was a bal-

ance due on the judgment upon which an execution could issue, and which an assignee could take by assignment.

Although White says he assigned the judgment for the benefit of Obadiah Jackson, and because he requested it, this does not accurately disclose the real nature of the transaction. Francis and Obadiah Jackson were brothers, and Obadiah, as Francis testifies, and has been before shown, had become indebted to him, on account of the division of their father's estate, many thousands of dollars. He found he was breaking up, and, not unnaturally, felt an anxiety to save something for his brother. His request to have the judgment assigned to Wilson was not for his own use, but for that of his brother, Francis, and not because the judgment had been paid, but because there was a balance due upon it. The parties did not treat the judgment as satisfied, but as still subsisting, and whether the consideration as between White and Francis Jackson was sufficient, is not material. Whether Wilson shall be held to be the trustee of Francis Jackson or of Horace White, concerns only those parties. If there was a balance unpaid on the judgment,— if the judgment was not, in equity, satisfied and discharged before the sale of these lots,—the sale is regular, and can not be set aside. Upon what terms subsequent creditors would be entitled to redeem from this sale, is a question not before us. The bill is framed upon the theory of the illegality of the sale, upon the ground that the judgment had been previously satisfied, and seeks to enforce no right of redemption.

We think there was a subsisting unsatisfied balance due upon the judgment, upon which an execution might issue; and so believing, it follows we approve of the decree of the court below. It will, therefore, be affirmed.

*Decree affirmed.*